[No. D012857. Fourth Dist., Div. One. Oct. 8, 1991.]

TENNECO WEST, INC., Plaintiff and Appellant, v.
FRANCHISE TAX BOARD, Defendant and Appellant.

## COUNSEL

Latham & Watkins, William R. Nicholas, Joseph A. Wheelock, Jr., Albert R. Rodriguez, Dwayne M. Horii and Deanna W. Detchemendy for Plaintiff and Appellant.

Ajalat & Polley, Ajalat, Polley & Ayoob, Charles R. Ajalat, Terry L. Polley and Richard J. Ayoob as Amici Curiae on behalf of Plaintiff and Appellant.

Daniel E. Lungren, Attorney General, Edmond B. Mamer and David S. Chaney, Deputy Attorneys General, for Defendant and Appellant.

## OPINION

**KREMER, P. J.**—Plaintiff Tenneco West, Inc.[1] appeals the portion of a judgment after court trial favoring defendant Franchise Tax Board of the State of California (the Board) on Tenneco's complaint for refund of franchise taxes paid. Tenneco contends the court should have found Tenneco and certain of its subsidiaries (the Tenneco Excluded Subsidiaries) constituted a single unitary business for franchise tax purposes.

The Board appeals the portion of the judgment favoring Tenneco. The Board contends the court should have apportioned the tax on Tenneco's installment sale gains on the basis of factors existing in the year of sale rather than in the year of receipt of each installment payment.

---

[1] In accord with the parties' stipulation, the court considered as plaintiffs Tenneco Inc., and numerous subsidiaries including named plaintiff Tenneco West, Inc. In this opinion "Tenneco" may refer to Tenneco Inc., or plaintiffs collectively.

We affirm the portion of the judgment favoring the Board on the unitary business issue. We reverse the portion of the judgment favoring Tenneco on the installment sale issue.

I

TENNECO'S APPEAL

A

FACTUAL AND PROCEDURAL BACKGROUND

For the years 1973 through 1976 (the years in issue) Tenneco's subsidiaries filed returns and paid tax under California's Bank and Corporation Tax Law.

In 1979 Tenneco filed amended returns and claims for refunds for the years in issue, asserting Tenneco and its subsidiaries were engaged in a single unitary business.

The Board audited Tenneco and its subsidiaries for the years in issue. After an administrative proceeding the Board permitted Tenneco to treat its subsidiaries in oil and oil related businesses (including land, gas, pipeline, agricultural and chemical activities) as being engaged in a single unitary business with each other during the years in issue (the Tenneco Unitary Group). The Board determined the Tenneco Excluded Subsidiaries—engaged in shipbuilding, packaging, automotive parts manufacturing, and manufacturing and selling construction and farm equipment—were not functionally integrated with the Tenneco Unitary Group and should be treated as separate businesses for tax purposes.[2]

---

[2]The Tenneco Excluded Subsidiaries consist of Newport News, Packaging, Walker and Case.

Newport News refers to Tenneco subsidiaries engaged in shipbuilding and related activities.

Packaging refers to Tenneco subsidiaries engaged in the packaging business and related activities.

Walker refers to Tenneco subsidiaries engaged in automotive parts manufacturing and related activities.

Case refers to Tenneco subsidiaries engaged in the business of manufacturing and selling heavy construction and agricultural tractors and related activities.

## B

### SUPERIOR COURT PROCEEDINGS

In 1987 Tenneco sued the Board for refund of franchise taxes paid. Tenneco's first cause of action sought a $2,759,928 refund on the ground such amount of assessed tax was void because all corporations comprising its affiliated group (the Tenneco Group) were assertedly engaged in a single unitary business. Tenneco alleged: "The Tenneco Group was engaged in a single unitary business in that there was unity of ownership, unity of operation, unity of use, and mutual dependency and contribution among all members of the Tenneco Group. The Tenneco Group had strong centralized management and centralized departments. In addition, several other characteristics of a unitary business existed, including, without limitation, interlocking Directors and Officers, numerous intercompany transfers, and a program of intercompany financing."

At trial Tenneco asserted its strong centralized management and intercompany financing were crucial factors warranting a unitary finding. The Board asserted the financial support and management oversight provided by Tenneco were not strong. The Board also asserted Tenneco was simply a normal parent to its "gigantic," "independent" and "autonomous" Tenneco Excluded Subsidiaries. According to the Board, Tenneco's California activities were separate and not dependent on its activities elsewhere.

After trial the superior court found the Tenneco Excluded Subsidiaries were not unitary businesses but instead should be treated as separate businesses for tax purposes. The court entered judgment favoring the Board on Tenneco's first cause of action. Tenneco appeals.

## C

### DISCUSSION

### 1

### PRINCIPLES OF UNITARY METHOD OF BUSINESS TAXATION

California imposes a franchise tax on corporations doing business within the state. The franchise tax is measured by net income derived from or attributable to in-state sources. (Rev. & Tax. Code,[3] §§ 23151, 25101.)

■ "The unitary method of taxing interstate businesses is a principle of taxation in which several elements of a business are treated as one unit for taxation purposes, with the goal of achieving a fair valuation. [Citation.] If a

---

[3] All statutory references are to the Revenue and Taxation Code unless otherwise specified.

business's operation within the state is dependent upon or contributes to the business's operation outside the state, the enterprise is a 'unitary business.' [Citation.] Without such dependency or contribution, each operation is considered as one or more separate business. When one or more business operations are considered separate businesses, each is required to pay a tax on its own income derived from sources within the state, without regard to the profit or losses of any related operation. However, if a business enterprise is a 'unitary business,' it files a combined report, and the income from its operations within the state is determined by a formula based on property, payroll and sales. (§§ 25128-25136.)" (*Rain Bird Sprinkler Mfg. Corp.* v. *Franchise Tax Bd.* (1991) 229 Cal.App.3d 784, 787-788 [280 Cal.Rptr. 362].)

■ "The unitary business formula apportionment method calculates the local tax base by first defining the scope of the unitary business, of which the enterprise's activities in the taxing jurisdiction form one part, and then apportioning the income of that unitary business between the taxing jurisdiction and the rest of the world based on the objective measures of the corporation's activities within and without the jurisdiction. [Citation.] A state may not tax a 'unitary business' unless some part of it is conducted in the state and the out-of-state activities are related in some concrete way to the in-state activities. [Citation.]" (*Mole-Richardson Co.* v. *Franchise Tax Bd.* (1990) 220 Cal.App.3d 889, 894-895 [269 Cal.Rptr. 662].)

2

## STANDARD OF REVIEW

■ Citing *Container Corp.* v. *Franchise Tax Bd.* (1983) 463 U.S. 159 [77 L.Ed.2d 545, 103 S.Ct. 2933] in its statement of decision, the trial court stated Tenneco "may not prevail in this action, unless the evidence *compels* a finding that the excluded subsidiaries constituted a unitary business with Tenneco and the included subsidiaries. A 'fair difference of opinion' as to whether the excluded subsidiaries were unitary with Tenneco will not justify this Court overruling the decision of the Franchise Tax Board. [¶] In ruling on cases such as this, it will serve little purpose for a State Court to turn every arguable claim that the Franchise Tax Board erred in its analysis of the 'unitary business' principle into a de novo adjudication. To do so would only serve to encourage further litigation of every decision that goes against a taxpayer. Rather, the Court's goal should be to determine whether the Franchise Tax Board applied the correct standards in this case, and if so,

whether its judgment 'was within the realm of permissible judgment.' " (Italics in original.)

The trial court also stated: "[I]n the instant action, it is not the Court's task to determine as a matter of law that the subject subsidiaries were unitary, or not. The issue before us is whether the decision of the Franchise Tax Board was within the realm of permissible judgment."

The trial court concluded: "In sum, the evidence before the Court did not *compel* a unitary finding. In the absence of such evidence, plaintiff's action must fail. Reasonable minds could differ as to whether the Franchise Tax Board's decision to exclude Newport News, Case, Packaging, and Walker was appropriate." (Italics in original.)

Tenneco contends the trial court erred in applying an incorrect scope of review and improperly denied Tenneco's right to a trial de novo.

■ While, as the Board points out, at trial Tenneco as taxpayer had the burden to prove entitlement to the refund claimed by a preponderance of the evidence (*Consolidated Accessories Corp.* v. *Franchise Tax Board* (1984) 161 Cal.App.3d 1036, 1039 [208 Cal.Rptr. 74]), the trial court's reliance on *Container Corp.* v. *Franchise Tax Bd., supra,* 463 U.S. 159, was misplaced. The "permissible judgment" test of that case involved United States Supreme Court deference—where a state court's decision was challenged as unconstitutional—to the state court's determination whether a particular set of activities constituted a unitary business where the state court's factual findings were supported by substantial evidence. (*Id.* at p. 176 [77 L.Ed.2d at p. 560].) ■ Regardless of which party had the burden of proof, the "permissible judgment" test was not relevant to the trial court's obligation to apply statutory, regulatory and case law to Tenneco's lawsuit against the Board for a refund. The trial court should have determined de novo whether Tenneco met its burden to prove by a preponderance of the evidence that the Tenneco Excluded Subsidiaries were engaged in a unitary business with Tenneco. (Cf. *Standard Oil Co.* v. *State Board of Equal.* (1936) 6 Cal.2d 557, 562 [59 P.2d 119]; *Consolidated Accessories Corp.* v. *Franchise Tax Board, supra,* at p. 1039; *Marchica* v. *State Board of Equalization* (1951) 107 Cal.App.2d 501, 513 [237 P.2d 725].)

Nonetheless, the trial court's misperception of its standard of review does not require reversal here. The case was presented upon stipulations of fact supplemented by oral testimony and documentary evidence. Many of the facts were undisputed. On those matters where the decisive facts were undisputed, we are confronted with questions of law and not bound by the trial court's findings. (*Mole-Richardson Co.* v. *Franchise Tax Bd., supra,* 220

Cal.App.3d at p. 894.) Further, on various disputed issues the trial court made factual findings.[4] We review those findings under the substantial evidence standard. Based upon the largely stipulated facts and the other facts reasonably found by the trial court, we may determine whether as a matter of law application of unitary treatment is appropriate. On this record we conclude the Tenneco Excluded Subsidiaries were not unitary with Tenneco.

3

## STIPULATED FACTS

Before trial the parties stipulated:

During the years in issue Tenneco had written policies that all capital expenditures by any Tenneco Group member exceeding $100,000 required top corporate management approval; all financing arrangements for any Tenneco Group member which would increase the subsidiary's indebtedness, obligate the subsidiary by guaranteeing another entity's obligations, or change the subsidiary's financial structure required prior approval by Tenneco's executive vice president for finance; all salaries in any Tenneco Group member exceeding $25,000 (raised to $50,000 in 1974) required approval by Tenneco's board of directors; any disposition of real property by any Tenneco Group member involving an amount exceeding $100,000 required approval by Tenneco's board of directors; and the engagement by any Tenneco Group member of a managerial consultant for a fee exceeding $25,000 required top corporate management approval.

Each Tenneco operating division including the Tenneco Excluded Subsidiaries was assigned a specific executive vice president with authority over its overall affairs. Each operating division was required to submit a detailed annual report to Tenneco's president's office setting forth its business strategy and forecast for the next five years; the president's office combined the divisional plans it approved into the comprehensive Tenneco five-year plan for presentation to Tenneco's board of directors.

---

[4] The trial court expressly found: The Tenneco Excluded Subsidiaries' lines of business were very different than those of Tenneco and the Tenneco Unitary Group. The Tenneco Excluded Subsidiaries' lines of business had no logical relation to Tenneco's oil and gas business. The strength of Tenneco's central management was doubtful. The corporate management relationship between Tenneco and the Tenneco Excluded Subsidiaries was such as would be present between any parent and its subsidiaries. Tenneco's long-range planning demonstrated nothing more than its potential to operate the subsidiaries as integrated divisions of a single unitary business. Tenneco's intercompany financing was no more than an investment. The intercompany financing was simply a corporate activity which would exist in most parent-subsidiary relationships.

Before the years in issue each member of the Tenneco Excluded Subsidiaries maintained its own corporate policy and procedure manuals. In September 1976 Tenneco issued a centralized corporate policy and procedure manual for use by the Tenneco Group.

Tenneco's president's office developed a performance planning and evaluation system to set standards of work performance for professional employees of the Tenneco Group and to assist in corporate manpower and succession planning. Tenneco also organized a management resources program, succession planning charts, and management courses.

Tenneco administered various centralized employee benefit plans. Tenneco offered a thrift plan and retirement plan but most Tenneco Group employees were not eligible to participate in either plan. Tenneco established an employees' stock ownership plan adopted by the Tenneco Excluded Subsidiaries. Tenneco maintained an executive incentive compensation plan for key personnel of Tenneco and its subsidiaries and divisions including the Tenneco Excluded Subsidiaries. Tenneco also offered a deferred compensation plan to selected employees of the Tenneco Group.

Tenneco maintained a legal department. Tenneco retained an accounting firm as independent auditor for all Tenneco Group members. Tenneco also maintained its own central accounting and internal audit departments. Tenneco's internal audit department reviewed the accounting, financial and other operations of Tenneco affiliates. The Tenneco Excluded Subsidiaries were audited.

Tenneco's tax department was available to help all Tenneco Group members in tax planning, compliance, and tax return preparation. Tenneco's subsidiaries filed separate state and local franchise and income tax returns. Tenneco's tax department was in charge of federal income tax matters and state and local ad valorem and property tax matters.

Tenneco's insurance and loss control department standardized some of the Tenneco Group's insurance functions by developing a uniform manual for accident reporting, claims and insurance.

Tenneco's corporate materials management department provided services to the Tenneco Group. Tenneco's special services department and later its telecommunications department coordinated and administered national accounts with vendors of telecommunications products and services to the Tenneco Group.

Tenneco maintained a contract for rental car discounts, a fleet automobile leasing contract and corporate discounts for lodging for the Tenneco Group.

Any Tenneco aircraft was available to all Tenneco Group members for use on company business with management approval. Tenneco personnel, Tenneco Excluded Subsidiaries personnel and members of Tenneco's president's office made trips on executive aircraft maintained and operated by Tenneco.

Tenneco maintained programs for scholarships, matching gifts and charitable contributions available to Tenneco Group employees and dependents.

Tenneco maintained a corporate library to circulate business and trade publications to Tenneco Group employees.

Tenneco paid for business organization memberships for Tenneco Group employees.

Tenneco's public relations and advertising department produced the Tenneco Magazine to inform Tenneco Group employees.

Tenneco's corporate identification manual prescribed the use of consistent verbal and visual messages throughout the Tenneco Group.

Tenneco sought to improve the Tenneco Group's corporate image though an advertising campaign. Tenneco produced two movies to show to Tenneco employees, the investment community and other groups interested in Tenneco. Product advertising at the operating division level used the division's logos and trademarks and mentioned the division was a Tenneco Group member.

Through borrowing, Tenneco raised large amounts of capital for its operating divisions' use.

There was no common sales force for the Tenneco Excluded Subsidiaries extending beyond operating division lines. There were insubstantial amounts (few or less than 1 percent) of intercompany sales between and among the Tenneco Excluded Subsidiaries. There were substantial amounts of intercompany sales between and among Tenneco Unitary Group members.

There were insubstantial amounts (few or none) of common warehousing, common customer ordering systems, common fabrication or manufacturing facilities, common handling of accounts receivable, common purchasing of raw materials or finished goods used in the manufacturing process, common research and development relating to products produced, common trafficking of products, or common inventories between and among both the members

1524

of the Tenneco Excluded Subsidiaries and members of the Tenneco Unitary Group.

Tenneco guaranteed a Packaging note purchase agreement and several of Newport News's contracts.

During the years in issue Newport News did not conduct any business within California. During the years in issue Case, Packaging and Walker did business within California.

During the years in issue Tenneco personnel made 328 trips to Newport News, 237 trips to Case, 184 trips to Walker and 153 trips to Packaging. During the years in issue Tenneco Excluded Subsidiaries personnel made 856 trips to Tenneco, including 204 trips by Newport News, 279 trips by Case, 189 trips by Walker, and 184 trips by Packaging. Tenneco's president's office members made 182 trips to Newport News, 116 trips to Case, 58 trips to Walker, and 114 trips to Packaging.

4

ANALYSIS

Tenneco contends the portion of the judgment favoring the Board must be reversed because Tenneco should be treated as having engaged in a single unitary business for franchise tax purposes during the years in issue. Citing California Code of Regulations, title 18, section 25120, subdivision (b)(3),[5] Tenneco asserts evidence suggesting all its operating divisions were

---

[5]California Code of Regulations, title 18, section 25120, subdivision (b), provides:

"(b) Two or More Businesses of a Single Taxpayer. A taxpayer may have more than one 'trade or business.' In such cases, it is necessary to determine the business income attributable to each separate trade or business. The income of each business is then apportioned by an apportionment formula which takes into consideration the instate and outstate factors which relate to the trade or business the income of which is being apportioned.

" . . . . . . . . . . . . . . . . . . . . . . . . . . .

"The determination of whether the activities of the taxpayer constitute a single trade or business or more than one trade or business will turn on the facts in each case. In general, the activities of the taxpayer will be considered a single business if there is evidence to indicate that the segments under consideration are integrated with, dependent upon or contribute to each other and the operations of the taxpayer as a whole. The following factors are considered to be good indicia of a single trade or business, and the presence of any of these factors creates a strong presumption that the activities of the taxpayer constitute a single trade or business:

"(1) Same type of business . . . .

"(2) Steps in a vertical process . . . .

"(3) Strong centralized management: A taxpayer which might otherwise be considered as engaged in more than one trade or business is properly considered as engaged in one trade or

governed by a strong central management, coupled with the existence of centralized departments, imported a strong unrebutted presumption the activities of Tenneco and its operating divisions including the Tenneco Excluded Subsidiaries constituted a single business and thus required unitary treatment of all of Tenneco. Tenneco also asserts the substantial intercompany financing it provided to the Tenneco Excluded Subsidiaries affected their operations and income to such extent as to require a finding they were engaged in a single unitary business with Tenneco.

(a)

Tests to Determine Unitary Business

■ "A general test to determine whether a business is unitary is ' "[i]f the operation of the portion of the business done within the state is dependent upon or contributes to the operation of the business without the state, . . . " ' [Citations.] A three-part test was set out in *Butler Brothers* v. *McColgan* (1941) 17 Cal.2d 664, 678 . . . , affirmed 315 U.S. 501 . . . , and remains viable today: '[T]he unitary nature of appellant's business is definitely established by the presence of the following circumstances: (1) Unity of ownership; (2) Unity of operation as evidenced by central purchasing, advertising, accounting and management divisions; and (3) Unity of use in its centralized executive force and general system of operation.' " (*Mole-Richardson Co.* v. *Franchise Tax Bd., supra*, 220 Cal.App.3d at p. 895.)[6]

■■■■ Section 25120 of the regulations also "sets forth criteria to evaluate the unitary nature of an enterprise." (*Mole-Richardson Co.* v. *Franchise Tax Bd., supra*, 220 Cal.App.3d at p. 895.)[7]

---

business when there is a strong central management, coupled with the existence of centralized departments for such functions as financing, advertising, research, or purchasing. Thus, some conglomerates may properly be considered as engaged in only one trade or business when the central executive officers are normally involved in the operations of the various divisions and there are centralized offices which perform for the divisions the normal matters which a truly independent business would perform for itself, such as accounting, personnel, insurance, legal, purchasing, advertising, or financing."

All regulation references are to title 18 of the California Code of Regulations unless otherwise specified.

[6]The Board concedes there was unity of ownership here.

[7]We note the United States Supreme Court has stated: "The prerequisite to a constitutionally acceptable finding of unitary business is a flow of *value*, not a flow of goods. As we reiterated in *F. W. Woolworth* [*Co.* v. *Taxation & Revenue Dept.* (1982) 458 U.S. 354, 364 (73 L.Ed.2d 819, 827-828, 102 S.Ct. 3128)] a relevant question in the unitary business inquiry is whether ' "contributions to income [of the subsidiaries] result[ed] from functional integration, centralization of management, and economies of scale." ' [Citations.]" (*Container Corp.* v. *Franchise Tax Bd., supra*, 463 U.S. at pp. 178-179 [77 L.Ed.2d 561-562], italics in original, fn. omitted.)

## (b)

### Centralized Management

■ Tenneco contends the trial court should have found all its operating divisions including the Tenneco Excluded Subsidiaries were directed by strong centralized management with complete policy control over the subsidiaries. Thus, according to Tenneco, it would have been entitled to the "strong presumption" under regulations section 25120, subdivision (b), that all Tenneco's activities constituted a unitary business. However, the regulation's presumption does not apply here because based upon substantial evidence the trial court effectively found Tenneco's central management was not strong.

■ As noted above, strong centralized management is important to the unitary business concept. (*Mole-Richardson Co.* v. *Franchise Tax Bd., supra,* 220 Cal.App.3d at p. 895, citing *Butler Brothers* v. *McColgan* (1941) 17 Cal.2d 664, 678 [111 P.2d 334]; regs., § 25120, subd. (b)(3).) "The integration of major executive functions is a factor of great importance pointing toward unity. [Citation.]" (*Container Corp. of America* v. *Franchise Tax Bd.* (1981) 117 Cal.App.3d 988, 998 [173 Cal.Rptr. 121].) "The integration of executive forces is an element of exceeding importance. It is top level management which is credited (or, in case of failure or indifferent results, debited) with the effects of corporate enterprises. . . . The 'major policy matters' are what count in our estimation of integration." (*Chase Brass & Copper Co.* v. *Franchise Tax Bd.* (1970) 10 Cal.App.3d 496, 504 [95 Cal.Rptr. 805].)

■ The trial court found Tenneco exhibited some degree of centralized management but noted substantial doubts about the strength of such centralized management. The court also found the management "set-up" between Tenneco and the Tenneco Excluded Subsidiaries was such as would exist between any parent and its subsidiaries. The court further found Tenneco's long-range planning demonstrated nothing more than the potential to operate its subsidiaries as divisions of a single unitary business. Although Tenneco presented contrary evidence bearing on the strength of its central management, substantial other evidence in the record supports the trial court's findings. That evidence showed the Tenneco Excluded Subsidiaries had a high degree of autonomy and Tenneco's policy control was neither strong nor uniform.

### (i)

■ Tenneco's public documents, policy manuals and speeches reflected Tenneco's policy of operating autonomy for its subsidiaries. Tenneco pub-

lished a booklet stating: "The Company is highly decentralized with each division given an unusual degree of autonomy." In 1975 Tenneco's executive vice president stated to Tenneco's management meeting: "Because of our jealously-guarded policy of operating autonomy on the part of the Tenneco companies, which is one of our real strengths, in many cases the interpretation and implementation of corporate policy can be, should be, and is, put in the hands of the subsidiary company staff." (*Chase Brass & Copper Co.* v. *Franchise Tax Bd., supra*, 10 Cal.App.3d at p. 504.) Tenneco's 1975 annual report stated: "Individually, Tenneco's subsidiaries and divisions further proved themselves competitive within their respective business spheres. Each major division operates within a management system that provides a high degree of local autonomy and flexibility of action, while at the same time deriving the benefits of financial and human resource support from the central management team—a system that historically has enabled each operating entity to score high marks within its individual industry." The report also noted "added strength comes from Tenneco's multi-industry operations and its service to a multiplicity of markets, which provide greater opportunity and flexibility across a much broader front than is available to single-industry, single-market business organizations."

In 1976 Tenneco's magazine quoted Tenneco's president: "Another important aspect of our system is the high degree of autonomy and flexibility it provides the presidents of our operating companies in the day-to-day conduct of their businesses. . . . [¶] The idea of autonomy for divisional company management has not only been advantageous but also very necessary for Tenneco . . . . Our operations demand it, as diversified and different in nature as we are. We will continue to operate in this manner." A 1976 management memo by Tenneco's president was similar: "Another important aspect of our system is the high degree of autonomy and flexibility it provides the presidents of our operating companies in the day-to-day conduct of their businesses. Here, too, we have been successful. . . . [¶] The idea of autonomy for divisional company management has not only been advantageous but also very necessary for Tenneco. Our operations demand it, as diversified and different in nature as they are. We will continue to operate in this manner."

In September 1976 Tenneco issued a corporate policy manual stating: "Because of the diversity of the Tenneco companies, it is the established policy that operating autonomy is necessary for divisional company management." An earlier manual had provided: "The Tenneco Inc. Policy and Procedures Manual provides a source of approved policies, procedures, instructions, and general information applicable to all departments of Tenneco Inc. Policies and procedures pertaining to a major component of Tenneco Inc. are included in the Policy and Procedures Manual of the

applicable component company." The September 1976 manual contained identical language but also applied to subsidiaries. The September 1976 manual did not cover various areas including internal audit, performance planning, records management and contracts.

Tenneco became involved in reviewing its subsidiaries' decisions only when those decisions involved millions of dollars.

Finally, according to testimony by an expert in management and accounting, most of Tenneco's business strategy and activities—including the annual planning process, weekly meetings between the chief executive officer and executive committee, internal audit, corporatewide procedures manual, financial strategy with debt targets and dividend payout ratios, approval of major capital expenditures, external financing, cash management, real property disposition, guaranties, loans and advances to and from divisions, insurance, and overruling subsidiaries' ideas—constituted "the kind of behavior that one would expect to find in any parent subsidiary or parent division relationship."

On this record the trial court could reasonably find Tenneco's degree of centralized management was not strong but instead simply evidenced such corporate activities as would exist in most parent-subsidiary relationships.

(ii)

 The record also supports a finding Tenneco did not have substantial centralized departments for various functions.

Tenneco's common advertising was minimal. Other than two corporate movies, there was no corporate advertising during 1974, 1975 or 1976. The Tenneco Excluded Subsidiaries produced their own product-related advertising under their own trade names mentioning parent Tenneco only incidentally.

Tenneco conceded there was little or no centralized research.

Tenneco conceded that during the years in issue there were insubstantial amounts of intercompany sales between and among members of the Tenneco Excluded Subsidiaries. Tenneco also conceded there were insubstantial amounts of common purchasing of raw materials used in the manufacturing process. A subsidiary president had authority to enter into purchasing arrangements with vendors and negotiate collective bargaining agreements with unions. Tenneco's 1976 corporate policy manual stated its subsidiaries should handle procurement of engineered equipment including mechanical

equipment, electrical equipment, instrumentation, valves, pipe, packaging equipment, oil well equipment, and farming equipment.

Although during the years in issue Tenneco had a legal department, the Tenneco Excluded Subsidiaries maintained autonomous legal activities. In 1976 Tenneco's general counsel told Tenneco's management meeting: "Most of our internal lawyers are house counsel employed at the operating division level. Each of our major divisions has its own legal staff reporting directly to its divisional management. The size of the staff depends upon the quantity and the nature of the division's legal problems. It may range from a single lawyer to over twenty; but whether composed of one or twenty lawyers, each divisional legal staff is directly responsible to its divisional management for the legal affairs of that division. This organization comports with Tenneco's basic management philosophy of operational responsibility and autonomy at the divisional level. It also gives our house counsel a deeper business knowledge of their particular corporate client and a closer relationship with its management than would be possible under a centralized legal organization at the parent company level."

Tenneco's manual for accident reporting, claims and insurance stated subsidiaries were to handle claims and litigation arising out of their operations. Subsidiaries were also to handle worker's compensation claims.

Most Tenneco employees were not eligible to participate in Tenneco's thrift plan or retirement plan.

Tenneco's tax department handled federal, ad valorem and property tax matters. Tenneco's central accounting and internal audit departments audited the subsidiaries periodically. However, the Tenneco Excluded Subsidiaries maintained their own accounting departments and filed their own separate state franchise and income tax returns. The subsidiaries' accounting and financial activities were subject to review by Tenneco and an outside auditing firm. ▇▇▇ ■ ■ However, in any event, centralized accounting without more is not a significant unitary factor. (*F. W. Woolworth Co.* v. *Taxation & Revenue Dept., supra,* 458 U.S. at p. 369, fn. 22 [73 L.Ed.2d at p. 83].)[8]

In sum, because the evidence showed strong central management and centralized departments were not present, regulations section 25120, subdivision (b)'s presumption of unity did not apply.

---

[8] " 'Central accounting, for instance, may result in some savings, but in most instances the amount is trifling in comparison with the income [involved]. Alone considered, it is too weak a connecting link to bind into one business, what would otherwise, from an operational standpoint, be considered separate businesses.' " (*F. W. Woolworth Co.* v. *Taxation & Revenue Dept., supra,* 458 U.S. at p. 369, fn. 22 [73 L.Ed.2d at p. 831], quoting Keesling & Warren, *The Unitary Concept in the Allocation of Income* (1960) 12 Hastings L.J. 42, 52.)

(iii)

 Citing *F. W. Woolworth Co.* v. *Taxation & Revenue Dept., supra,* 458 U.S. 354, the trial court found Tenneco's long-range policy planning showed "nothing more than its *potential* to operate the subsidiaries as 'integrated divisions of a single unitary business.' " (Italics in original.) In *F. W. Woolworth Co.* the Supreme Court noted "the *potential* to operate a company as part of a unitary business is not dispositive when, looking at 'the "underlying economic realities of a unitary business," ' the dividend income from the subsidiaries *in fact* is 'derive[d] from "unrelated business activity" which constitutes a "discrete business enterprise." ' [Citations.]" (*Id.* at p. 362 [73 L.Ed.2d at p. 826], italics in original.)

Citing *F. W. Woolworth Co.* v. *Franchise Tax Bd.* (1984) 160 Cal.App.3d 1154 [207 Cal.Rptr. 149], the trial court also noted certain managerial links—including interlocking boards of directors and frequent communication between upper management levels—are characteristic of any parent and its wholly owned subsidiary and without more are not relevant on the issue of unity. (*Id.* at p. 1161.) In *F. W. Woolworth Co.* all directors of Woolworth Canada were also directors and officers of Woolworth U.S. (*Id.* at pp. 1156-1157.) Further, all directors of Woolworth Canada were with one exception members of the executive committees of both Woolworth U.S. and Woolworth Canada. (*Id.* p. 1157.) The Woolworth U.S. board of directors selected the members of the board of directors and officers of Woolworth Canada; such selection was subject to approval by Woolworth U.S.'s chief executive officer. (*Ibid.*) Nonetheless, the appellate court found "the degree of centralization of management between Woolworth U.S. and Woolworth Canada was no more than could be expected between any parent company and a wholly owned subsidiary." (*Id.* at p. 1161.) The appellate court concluded the two businesses' operations were not "functionally integrated" or unitary. (*Id.* at pp. 1161-1162.) Similarly, the trial court here reasonably concluded Tenneco's management's involvement with the Tenneco Excluded Subsidiaries did not extend significantly beyond the normal review and oversight by a parent over its subsidiaries.[9]

Tenneco's reliance on *Mole-Richardson Co.* v. *Franchise Tax Bd., supra,* 220 Cal.App.3d 889, is unavailing. In *Mole-Richardson Co.* the executive officer directly supervised the operations, all services were performed from one central office and there were economies of scale. (*Id.* at p. 899.) In distinguishing *Mole-Richardson Co.* the trial court here reasonably concluded Tenneco did not demonstrate with respect to its management system the

---

[9]We note the Tenneco Excluded Subsidiaries shared few common officers.

same contribution and dependency or economies of scale but instead showed at most only control over long range planning and goals.

In sum, the record supports the trial court's finding Tenneco did not have a substantial degree of centralized management.

### (c)

### INTERCOMPANY FINANCING

■ The trial court found Tenneco's intercompany financing was no more than an investment function of a nonunitary nature. The court also found such intercompany financing was simply a corporate activity which would exist in most parent-subsidiary relationships.

Tenneco contends intercompany financing between Tenneco and the Tenneco Excluded Subsidiaries dictated a unitary determination. Tenneco asserts there was no way to quantify the effect on the Tenneco Excluded Subsidiaries of the "massive transfer of value by intercompany financing."[10] Tenneco asserts such transfers constituted "contribution" by Tenneco and made the Tenneco Excluded Subsidiaries dependent on Tenneco. However, substantial evidence supports the trial court's findings.

The flow of capital resources from a parent to its subsidiaries "can serve either an investment function or an operational function." (*Container Corp.* v. *Franchise Tax Bd., supra,* 463 U.S. at p. 180, fn. 19 [77 L.Ed.2d at p. 562].) ■ An element necessary for a unitary determination is "that the out-of-state activities of the purported 'unitary business' be related in some concrete way to the in-state activities. The functional meaning of this requirement is that there be some sharing or exchange of value not capable of precise identification or measurement—beyond the mere flow of funds arising out of a passive investment or a distinct business operation—which renders formula apportionment a reasonable method of taxation." (*Id.* at p. 166 [77 L.Ed.2d at p. 554].)

■ "Investment in a business enterprise truly 'distinct' from a corporation's main line of business often serves the primary function of diversifying the corporate portfolio and reducing the risks inherent in being tied to one industry's business cycle. When a corporation invests in a subsidiary that engages in the same line of work as itself, it becomes much more likely that one function of the investment is to make better use—either through

---

[10]Tenneco presented evidence daily intercompany cash transfers averaged $20 million to $25 million.

economies of scale or through operational integration or sharing of exper-tise—of the parent's existing business-related resources." (*Container Corp. v. Franchise Tax Bd., supra,* 463 U.S. at p. 178 [77 L.Ed.2d at p. 561].)[11] The evidence here supports the trial court's finding Tenneco's invest-ment in the Tenneco Excluded Subsidiaries primarily served to diversify its corporate portfolio and reduce business cycle risks instead of making better use of Tenneco's existing resources through economies of scale, operational integration or sharing of expertise.

Tenneco's 1975 corporate strategic plan for 1976 through 1980 stated: "Tenneco is committed to its multi-industry operation and will work towards maintaining a balanced portfolio of investments and assets to level out peaks and valleys in individual businesses and provide for constant growth and security of earnings." (See *Container Corp. v. Franchise Tax Bd., supra,* 463 U.S. at p. 178 [77 L.Ed.2d at p. 561].) According to Tenneco's finance expert, Tenneco's organizational structure and diversification were intended to develop a multi-industry operation to level out peaks and valleys and provide growth opportunities to allocate funds. (*Ibid.*) An expert in manage-ment and accounting testified Tenneco's financing activities—including cash management and loans and advances to and from divisions—constituted "the kind of [stewardship] behavior that one would expect to find in any parent subsidiary or parent division relationship." The management and accounting expert also testified the substantial intercompany financing here was "very typical" and its absence would be "highly unusual."

Finally, an economics expert testified the shared and joint costs between Tenneco and the Tenneco Excluded Subsidiaries were not sufficiently sub-stantial to justify a unitary determination. According to the economics expert, it would be better to measure the Tenneco Excluded Subsidiaries' income on a normal separate accounting basis because Tenneco and the subsidiaries were in very different lines of business and thus there was much less possibility of "spill-overs" and indirect economic effects from a subsid-iary to Tenneco. The economics expert also stated that due to the different lines of business Tenneco management was not in the position to "transfer value in some unquantifiable way from one [subsidiary] to the other." (*Container Corp. v. Franchise Tax Bd., supra,* 463 U.S. at pp. 164-166 [77 L.Ed.2d at p. 552-553].)[12] On this record the trial court reasonably found

---

[11]The trial court quoted the language from *Container Corp. v. Franchise Tax Bd., supra,* 463 U.S. at page 178 [77 L.Ed.2d at p. 561], in noting the Tenneco Excluded Subsidiaries were engaged in lines of business having no logical relation to Tenneco's oil business and thus it was more difficult for Tenneco to show that one of the functions of the Excluded Subsidiaries was to make better use of Tenneco's existing business related resources through economies of scale, operational integration or sharing of expertise.

[12]"The problem with [the separate accounting method] is that [it] is subject to manipulation and imprecision, and often ignores or captures inadequately the many subtle and largely

Tenneco did not show its intercompany financing had a substantial operational function rather than simply an investment function. (*Id.* at p. 180, fn. 19 [77 L.Ed.2d at p. 562].)

In sum, a unitary determination depends upon the facts in each case. (Regs., § 25120, subd. (b).) Based upon the stipulated facts and other facts reasonably found, we must determine whether on balance relevant factors point to a unitary determination. Here, we conclude those factors warrant a conclusion the Tenneco Excluded Subsidiaries were not in a unitary business with Tenneco. Tenneco had weak central management. Tenneco lacked substantial centralized departments. The businesses of the Tenneco Excluded Subsidiaries and Tenneco had a history of separateness and were of a diverse unrelated nature. Tenneco's intercompany financing served an investment function, not an operational function. Thus, the activities of the Tenneco Excluded Subsidiaries were not so integrated with Tenneco's oil related businesses or with each other so as to constitute a unitary business for purposes of franchise taxation. The trial court correctly entered judgment favoring the Board on Tenneco's first cause of action.

## II

### THE BOARD'S APPEAL

### A

### FACTUAL AND PROCEDURAL BACKGROUND

Between 1969 and 1976 in the regular course of business Tenneco West and its predecessor entities and subsidiaries sold California real properties on an installment basis to unrelated third parties. The properties sold did not constitute a substantial portion of the business assets of Tenneco West or its affiliates.

Tenneco West elected to report the income from the sales by the installment method.[13] Tenneco West reported the installment income received during the years in issue using apportionment factors of the year the income was received. The Board disallowed this method and contended Tenneco West should report its income using apportionment factors from the year the properties were sold.

---

unquantifiable transfers of value that take place among the components of a single enterprise." (*Container Corp.* v. *Franchise Tax Bd., supra,* 463 U.S. at pp. 164-165 [77 L.Ed.2d at p. 553].)

[13]The installment method allowed postponement of taxation of installment sale income until actual receipt of the income.

For tax years 1969 through 1972 Tenneco West's California apportionment percentage was about 88 percent. Beginning with tax year 1973 the Board agreed Tenneco West's operations should be combined in a unitary business with the operations of Tenneco subsidiaries engaged in the natural gas pipeline business, the oil business, the chemical business, and related activities. As a result, the California apportionment percentage dropped to less than 10 percent.

## B

### SUPERIOR COURT PROCEEDINGS

In 1987 Tenneco sued the Board for refund of franchise taxes paid from 1973 through 1976. Tenneco's second cause of action sought a $1,500,859 refund on the ground such amount of assessed tax was assertedly void because any gain on the installment sales should be apportioned on the basis of factors existing in the year each installment payment was actually received.

Tenneco asserted under the Board's legal ruling No. 267 (issued in 1964) apportionment factors of the year of receipt of installment income should be used. The Board asserted under its legal ruling No. 413 (issued in 1979) apportionment factors of the year of sale should be used.

The matter was tried on stipulated facts. After trial the superior court concluded the Board erred in using apportionment factors of the year of sale. The court entered judgment favoring Tenneco allowing taxation of income from installment sales to be apportioned according to factors existing in the year income was received. The Board appeals.

## C

### DISCUSSION

### 1

 The Board contends allowing apportionment of income from installment sales on the basis of factors existing in the year of receipt of income resulted in apportionment based on activities having no connection

to the activities producing the income.[14] The Board contends the court instead should have upheld the Board's determination Tenneco must use factors of the year of sale because such factors more closely reflected the activities giving rise to the income. We agree and reverse the portion of the judgment favoring Tenneco on the installment sale issue.

### THE BOARD'S LEGAL RULINGS

#### (a)

The Board's legal ruling No. 267 considered the question: "When including in the year 1958 the income from installment sales made in the year 1957 and collected in 1958, is the allocation percentage to be applied the percentage computed for the year 1957 or the percentage computed for the year 1958?" The ruling concluded: "Although precise authority is lacking on the question, it is concluded that income from installment sales is allocable by the apportionment formula computed for the year in which the income is reported. There is no compelling reason to deviate from the annual accounting concept, that is, determining each year's income (in the instant situation, each year's *allocation*) with reference only to the events of that year. In most, if not all, cases of income allocation, while the apportionment formula is computed from current year's sales, payroll, and property, at least some of the factors (a portion of the payroll and property) from which the income is derived entered the computation of a prior year's formula, and some of the same factors entering the current year's formula will be responsible for a subsequent year's income. In other words there is not, and cannot be, an absolute correlation between the income allocated in any year, and the amounts going into the factors making up the allocation formula. In the case of installment sales, there is the additional circumstance that the actual sale activity occurred in a year prior to that in which the income is reported, but that is merely an additional instance of activity occurring in one year while income derived from it is reported in a subsequent year. And it does not require a deviation from the general practice of allocating income by a formula computed for the year in which the income is reported." (Italics in original.)

#### (b)

The Board's legal ruling No. 413 considered the question: "What year's factors are utilized to apportion the gain as it is reported?" The ruling

---

[14]Specifically, the Board asserts permitting apportionment of income from installment sales—most of which occurred when the business activities of the sellers were separate and distinct—on the basis of factors of an entire unitary business for years after the sales occurred would result in a "total mismatching of income and factors" because the factors of the larger unitary business would be used to apportion income arising from the conduct of what was an entirely separate business at the time of the sales.

concluded "factors of the year of sale should be utilized in apportioning the gain or loss regardless of the installment sale election." The ruling provided: "Income from installment sales is reported at least in substantial part in a year other than the year in which the sale took place. Apportionment of installment sale income on the basis of the factors in the year the income is reported or received would result in such income being apportioned by activities which had no connection with the earning of the income. The Board of Equalization held in [*Appeal of Donald M. Drake Company* (¶ 205-598), March 2, 1977], that the use of an apportionment factor which does not fully reflect the activities which give rise to the income was a distortion and that therefore a variance from the standard formula under § 25137 is authorized. [¶] The Board of Equalization in *Drake, supra*, approved the use of a method which reflected all the activities which give rise to the income. Based upon the Board of Equalization's reasoning in *Drake, supra*, the gain or loss from an installment sale should be apportioned on the basis of the factors of the year of sale regardless of the year in which such gain or loss is actually reported."

The Board's legal ruling No. 413 applies retroactively because the ruling does not expressly restrict its applicability to prospective operation. (§ 26422.)[15]

2

SUPERIOR COURT'S DECISION

The trial court stated the Board's legal rulings Nos. 267 and 413 did not conflict and could "be easily reconciled." Noting the parties stipulated the installment sales were in the normal course of Tenneco West's business and the property sold did not constitute a substantial portion of Tenneco West's business assets, the court concluded there was no reason to deviate from the annual accounting principle underlying ruling No. 267. The court interpreted the rationale for ruling No. 413 as the likelihood a taxpayer's sale of a substantial portion of its business assets would result in a dramatic change in apportionment factors in later years.

---

[15]Section 26422 provides: "The Franchise Tax Board shall have the power and it shall be its duty to administer this part. It shall prescribe all such rules and regulations as are necessary and reasonable to carry out the provisions of this part and may prescribe the extent, if any, to which any ruling or regulation shall be applied without retroactive effect."

3

ANALYSIS

The parties have presented the installment sale matter on stipulated facts and ask us to resolve their dispute concerning the appropriate Board legal ruling applicable to those facts. In this context as presented to us, the issue is whether the factors in the year the property was sold or the factors in the year the income was received should be used to determine the apportionment of the installment income. We look to the Board's legal rulings Nos. 267 and 413 for guidance. The wisdom of those rulings is not before us. Instead, we seek only to discern their meaning and scope in order to determine their applicability here.

"Under the annual accounting concept, the general rule is that income of the taxable year is computed without regard to prior or subsequent transactions." (Board's legal ruling No. 026.) Tenneco essentially contends, and the superior court concluded, the rationale for the Board's legal ruling No. 413's deviation from the annual accounting principle was the fact the taxpayer sold a substantial portion of its business assets. However, the scope of ruling No. 413 is not so limited. Application of ruling No. 413 does not depend upon whether a taxpayer sells a substantial portion of its business assets.[16] Instead, ruling No. 413 provides the general rule for apportioning installment income in most circumstances: "the gain or loss from an installment sale should be apportioned on the basis of the factors of the year of sale regardless of the year in which such gain or loss is actually reported." Further, ruling No. 413's express rationale for departing from the annual accounting method is the "distortion" which would result from using "an apportionment factor which does not fully reflect the activities which give rise to the income . . . ."

The Board's legal ruling No. 413 does not specifically refer to the Board's legal ruling No. 267. However, ruling No. 413 carves out a limited qualified exception for a taxpayer who in the regular course of business makes installment sales as a dealer in tangible personal property under circumstances where the apportionment factors do not vary significantly from year to year. That exception might apply to a taxpayer engaged in retail sales similar to the taxpayer involved in ruling No. 267. However, ruling No. 413's exception does not refer to installment sales of real property.

 In sum, as noted by the Board's legal ruling No. 413, apportioning installment sale income here on the basis of the factors in the year the

---

[16]We note the example included in the Board's legal ruling No. 413 to illustrate its application is not specifically dependent upon a taxpayer selling a substantial portion of its business assets.

income was received would result in apportionment of income by activities having no connection to the earning of the income. Apportionment based upon factors of the year of sale more closely reflects the activities which gave rise to the income.

The trial court erred in entering judgment favoring Tenneco on the second cause of action allowing taxation of income from installment sales to be apportioned according to factors in the years the income was received. The court should have entered judgment upholding the Board's determination installment sales income should be reported using apportionment factors for the year of sale.

## DISPOSITION

The portion of the judgment favoring plaintiff Tenneco West, Inc., on the second cause of action is reversed. The superior court is directed to enter judgment favoring the Franchise Tax Board on the second cause of action. The remainder of the judgment is affirmed. The Franchise Tax Board shall have costs on appeal.

Todd, J., and Benke, J., concurred.

A petition for a rehearing was denied November 4, 1991, and the petition of appellant Tenneco West, Inc., for review by the Supreme Court was denied January 30, 1992.