NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@state.vt.us or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2015 VT 137

No. 2014-312

| | |
|---|---|
| AIG Insurance Management Services, Inc. | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Washington Unit, |
| | Civil Division |
| | |
| Vermont Department of Taxes | February Term, 2015 |

Helen M. Toor, J.

Eric A. Poehlmann and Wm. Roger Prescott of Downs Rachlin Martin PLLC, Burlington, for
  Plaintiff-Appellee/Cross-Appellant.

William H. Sorrell, Attorney General, and Mary L. Bachman and Margaret A. Burke, Assistant
  Attorneys General, Montpelier, for Defendant-Appellant/Cross-Appellee.

PRESENT: Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.

¶ 1.   **REIBER, C.J.**   This case presents the question of whether Mount Mansfield Company, Inc. (MMC) had unitary operations with AIG Insurance Management Services, Inc. (AIG) such that AIG was required to include MMC as part of the AIG unitary group on its Vermont corporate income tax return. It also raises the question of whether, and under what circumstances, an amended tax return restarts the statute of limitations period for collecting a deficiency. The trial court reversed the decision of the Commissioner of the Department of Taxes that there were unitary operations, and concluded that MMC is a discrete business enterprise distinct from AIG's insurance and financial business. The Department appeals, arguing that the evidence supports the Commissioner's decision that MMC was part of the AIG unitary group.

AIG cross appeals, arguing that the tax assessment was barred by the statute of limitations. We affirm the court's conclusion that MMC's operations were not unitary with AIG and therefore do not reach the statute-of-limitations issue.

¶ 2. This appeal concerns the scope of this state's ability to tax a business operating in interstate commerce. "Under both the Due Process and the Commerce Clauses of the Constitution, a state may not, when imposing an income-based tax, 'tax value earned outside its borders.'" Container Corp. of Am. v. Franchise Tax Bd., 463 U.S. 159, 164 (1983) (quoting ASARCO Inc. v. Idaho State Tax Comm'n, 458 U.S. 307, 315 (1982)). To tax income generated in interstate commerce, "the Due Process Clause of the Fourteenth Amendment imposes two requirements: a 'minimal connection' between the interstate activities and the taxing State, and a rational relationship between the income attributed to the State and the intrastate values of the enterprise." Mobil Oil Corp. v. Comm'r of Taxes of Vt., 445 U.S. 425, 436-37 (1980) (quoting Moorman Mfg. Co. v. Bair, 437 U.S. 267, 272-73 (1978)). A state may tax income that is generated by business in another state "so long as the intrastate and extrastate activities formed part of a single unitary business." Id. at 438. This "unitary-business principle" provides that a state may impose an apportioned tax on income from a multistate business if the business's operations in the taxing state have a sufficient nexus to the unitary operations outside of the state. Id. Here, the question is whether MMC is part of a "functionally integrated enterprise" with AIG such that an apportioned share of the income earned by the AIG unitary group out of state may be taxed by Vermont. Id. at 440.

¶ 3. We conclude that, although AIG had sole ownership and the ability to direct MMC's operations given its power of appointment to MMC's Board and its exclusive role providing financing, MMC was a distinct business operation. Evidence is absent of a linkage of economic realities between the business enterprise in Vermont and AIG's operations outside the state. No interdependence of functions or use existed amounting to an exchange of value accruing

2

to AIG across state lines. AIG met its burden of demonstrating that MMC was not unitary with the rest of AIG's operations given that there were no economies of scale realized by the entities' operations, MMC's business was not functionally integrated with AIG's business, and AIG did not actually direct MMC's policy or operations.

## I. Factual and Procedural Background

¶ 4. The following facts were found by the Commissioner. AIG is a multinational corporation, owning approximately 700 subsidiary corporations worldwide. AIG has four general operating segments: general insurance, life insurance and retirement services, financial services, and asset management. In 2006, AIG was the largest insurance company in the world. MMC is wholly owned by AIG, and has its principal place of business in Stowe, Vermont. MMC operates and does business as the Stowe Mountain Resort. It is primarily a ski resort, and also offers year-round accommodations and summer attractions.

¶ 5. The taxes at issue are for the 2006 tax year, the first year for which Vermont required unitary combined reporting. AIG filed its 2006 tax return in October 2007. AIG included MMC in its Vermont unitary group in that return. The Department discovered a mathematical error in the return, corrected the error and, in August 2008, assessed AIG for the deficiency. AIG acknowledged the error, paid the tax, and the Department abated the assessment. In March 2009, AIG filed an amended return, in which it removed MMC from the unitary group, and requested a refund of $789,246. In February 2011, as a result of an audit of the amended return, the Department rejected AIG's exclusion of MMC from the unitary group, and assessed AIG additional tax of $60,440, plus interest and a penalty. AIG appealed the assessment. In September 2011, the Department formally denied AIG's refund request, and AIG also appealed that denial. AIG's two appeals were consolidated for a hearing. AIG argued that the 2011 assessment was barred by the three-year statute of limitations, and that the refund was improperly

denied because MMC was merely an investment and not part of the AIG unitary group for tax-reporting purposes.

¶ 6. The Department held a two-day hearing before a hearing officer. At the hearing, the Department presented evidence from a tax department auditor and compliance officer. AIG presented testimony from several employees.

¶ 7. Following the hearing, the Commissioner found that MMC was part of AIG's unitary group and affirmed the denial of the refund request. The Commissioner made extensive findings on MMC's operations, including the following: MMC is wholly owned by AIG; AIG included MMC in its unitary group on returns in all fifteen other states with unitary combined filing; MMC employees obtained life insurance and ERISA-related benefits through AIG; AIG provided MMC with financial, regulatory, and accounting services; MMC had two lines of credit from AIG that exceeded 150% of MMC's gross operating revenue and no loans from other lenders; MMC's board members were appointed by AIG; MMC had a joint venture with an AIG subsidiary to develop real estate sales; MMC provides discounts for AIG employees and their families; and AIG sponsored events at MMC. The Commissioner concluded based on these facts that AIG was directly involved in the financial operations of MMC, managing its real estate expansion, providing financial and asset-management expertise, and using MMC to build its brand, and broker and other businesses, and therefore that AIG had failed to meet its burden to show that MMC was not a member of the AIG unitary group. As to the statute-of-limitations argument, the hearing officer further concluded that the 2011 assessment was not barred because AIG's 2009 amended return was the first complete return, and therefore the three-year statute of limitations did not begin to run until the date the amended return was filed.

¶ 8. AIG appealed the Commissioner's decision to the civil division of the superior court. The court affirmed on the limitations issue, concluding that until the amended returns were

filed the Department lacked a full picture of taxpayer's liability and therefore that the limitations period began to run with the filing of the amended return.

¶ 9.     As to whether MMC was part of AIG's unitary business, the court concluded that the Commissioner's findings were not supported by the record. The court concluded that the evidence did not reasonably support the determination that AIG used MMC for marketing purposes, exerted managerial control over MMC, or lent it expertise. The court also concluded that the evidence was insufficient to show that MMC benefitted from below-market financing. The court stated that the limited connections that the evidence demonstrated were that MMC employees received ERISA-related benefits through AIG, MMC borrowed money from AIG, MMC received some corporate services from AIG, AIG owned residences at MMC, AIG companies held conferences at MMC, and AIG employees received discounts at MMC. The court concluded that these activities were insufficient to demonstrate that MMC had unitary operations with the rest of the AIG group. Instead, the court concluded that the evidence showed that AIG's investment in MMC was passive, and that it was a discrete business unrelated to AIG's insurance and financial business.

¶ 10.     The Department appeals the court's decision to remove MMC from the AIG unitary group. AIG cross-appeals, arguing that the court erred in concluding that the assessment was within the limitations period.

## II.  Unitary Enterprise

¶ 11.     The Department argues that MMC is a member of the unitary AIG group. On appeal, this Court reviews the Commissioner's decision " 'directly, independent of the conclusion on the intermediate, on-the-record appeal of the superior court.' " Quazzo v. Dep't of Taxes, 2014 VT 81, ¶ 13, 197 Vt. 278, 103 A.3d 458 (quoting In re Williston Inn Grp., 2008 VT 47, ¶ 11, 183 Vt. 621, 949 A.2d 1073 (mem.)). The Commissioner's decision is reviewed under a

5

"deferential standard."[1]  Id.  Further, we defer to the agency's interpretation of statutes under its administration and its interpretation of Department regulations.  Id. ¶ 12.  Where, however, an agency's interpretation of a statutory provision implicates constitutional questions, no deference is afforded.  In re Vt. Ry., 171 Vt. 496, 500, 769 A.2d 648, 652-53 (2000) (explaining that deference is afforded to agency's interpretation of statutes in subject matter in which agency possesses particular expertise and does not extend to constitutional questions).  As to findings of fact, they will be affirmed "unless clearly erroneous."  Travia's Inc. v. Dep't of Taxes, 2013 VT 62, ¶ 12, 194 Vt. 585, 86 A.3d 394.  The credibility of witnesses, weight of the evidence, and inferences that reasonably may be drawn from the evidence are matters for the Commissioner and, as long as the evidence supports the decision, we will affirm.  See Houle v. Ethan Allen, Inc., 2011 VT 62, ¶ 18, 190 Vt. 536, 24 A.3d 586 (mem.); Rock v. Dep't of Taxes, 170 Vt. 1, 11, 742 A.2d 1211, 1219 (1999) (explaining that as factfinder it is up to department "to resolve contradictory evidence").

A.  Burden of Proof

¶ 12.  The burden of proof is on AIG as taxpayer to show that the assessment was incorrect.  Travia's Inc., 2013 VT 62, ¶ 12.  On appeal, the parties dispute the level of proof that taxpayer must meet.  The Commissioner determined that, based on language in the U.S. Supreme Court's decision in Container Corp., the taxpayer has the burden of producing clear and cogent evidence that its business is not unitary, and applied this standard to AIG's evidence.  AIG argues that the clear-and-cogent standard applies to the method of apportionment, but not to the determination of whether a corporate taxpayer's business is unitary with out-of-state entities.

---

[1]  AIG contends that de novo review should apply because the issues raised on appeal are novel.  This Court's deference to agency decisions within the agency's area of expertise is not dependent on whether the issue is one of first impression.  See TD Banknorth, N.A. v. Dep't of Taxes, 2008 VT 120, ¶¶ 19, 26, 185 Vt. 45, 967 A.2d 1148 (reviewing novel question under deferential standard of review).

¶ 13.    We agree with the Department that the language of Container Corp. does not limit the clear-and-cogent-evidence burden to the apportionment question and the proper standard here is proof by clear and cogent evidence.  The U.S. Supreme Court specifically indicated that it was considering "the unitary business issue" and then stated that a taxpayer has "the distinct burden of showing by clear and cogent evidence that the state tax results in extraterritorial values being taxed." Container Corp., 463 U.S. at 175 (quotation and alterations omitted).

¶ 14.    Several other state courts have interpreted Container Corp. in this manner and have required taxpayers to show by clear and cogent evidence that the instate business was not unitary with the operations outside the state.  See, e.g., Alaska Gold Co. v. Dep't of Revenue, 754 P.2d 247, 251 (Alaska 1988) (requiring taxpayer to demonstrate by clear and cogent evidence that businesses not unitary); Gen. Mills, Inc. v. Comm'r of Revenue, 795 N.E.2d 552, 561 (Mass. 2003) (reciting that taxpayer has burden by clear and cogent evidence of showing that state is taxing extraterritorial value); Geoffrey, Inc. v. Okla. Tax Comm'n, 2006 OK CIV APP 27, ¶ 25, 132 P.3d 632 (explaining that corporate taxpayer has burden of proving by clear and cogent evidence that it is not unitary business); Glatfelter Pulpwood Co. v. Commonwealth, 61 A.3d 993, 1010-11 (Pa. 2013) (stating that taxpayer has burden of showing that tax scheme results in taxation of extraterritorial value by clear and cogent evidence).

¶ 15.    AIG cites Tenneco West, Inc. v. Franchise Tax Board, 286 Cal. Rptr. 354 (Ct. App. 1991), in support of its argument that a taxpayer's burden is by a preponderance of the evidence.  In that case, the court concluded that several subsidiaries were not engaged in a unitary business with Tenneco, and Tenneco appealed, arguing that the operations were unitary.  On review, the appeals court explained that the trial court should have determined "whether Tenneco met its burden to prove by a preponderance of the evidence that the Tenneco Excluded Subsidiaries were engaged in a unitary business with Tenneco." Id. at 358.

¶ 16. Tenneco is distinguishable from the situation here because in that case the taxpayer was seeking a refund based on its assertions that its operations were unitary. In contrast, where a taxpayer is seeking to show its operations are not unitary, the taxpayer must demonstrate by clear-and-cogent evidence that the State's unitary finding is incorrect, and therefore outside the scope of what may be constitutionally taxed. Indeed, this standard has been applied by a California court to a taxpayer's challenge to a finding of unitary operations. See A. M. Castle & Co. v. Franchise Tax Bd., 43 Cal. Rptr. 2d 340, 435 (Ct. App. 1995) (citing Container Corp. and reciting that taxpayer has burden of demonstrating by clear-and-convincing evidence that state is taxing extraterritorial value). Here, where the state has determined that the company's out-of-state operations are unitary with in-state activities and taxable and the taxpayer is seeking to prove that such taxation is beyond constitutional boundaries, Container Corp. requires that taxpayer prove by clear-and-cogent evidence that its operations are not unitary and therefore not taxable.[2]

### B. Legal Standard

¶ 17. The combined unitary reporting statute provides the parameters for determining when a business's out-of-state income may be taxed by Vermont. When the statute was enacted,

---

[2] In determining that MMC was not part of the AIG unitary group, the superior court also misstated the burden of proof. In finding that the Department's evidence was insufficient, the court emphasized the fact that all of the witnesses at the hearing providing testimony relevant to the issue of integrated operations were presented by AIG. This was proper insofar as the burden rested on AIG. Further, the fact that the evidence came exclusively from AIG serves only to highlight the need for the high burden of proof. The evidence relevant to a business's operations is uniquely available to that business. Therefore, it is reasonable to place the burden on the company to demonstrate by clear-and-cogent evidence that its operations are distinct and not unitary.

Further, the superior court misconstrued the burden of proof when it concluded that the Department failed to offer a reason why the testimony of the AIG executives that MMC was a discrete business enterprise should be disregarded. The Department was not required to disprove AIG's evidence. The burden was on AIG to put forth the necessary evidence. Moreover, the Department was not required to credit the AIG executives' description of the two companies as discrete enterprises. This is a conclusion to be made from the evidence, not a matter of evidentiary fact.

In any event, on appeal to this Court, we review the Commissioner's decision directly and do not afford deference to the superior court's decision.

the Legislature indicated that unitary reporting was adopted "[i]n recognition of the fact that corporate business is increasingly conducted on a national and international basis," and that the unitary reporting system would "put all corporations doing business in Vermont on an equal income tax footing." 2003, No. 152 (Adj. Sess.), § 1. To accomplish this goal, the statute directs that for a corporation "that is a member of an affiliated group and that is engaged in a unitary business with one or more other members of that affiliated group, 'Vermont net income' includes the allocable share of the combined net income of the group." 32 V.S.A. § 5811(18)(C). An "affiliated group" is defined as "a group of two or more corporations in which more than 50 percent of the voting stock of each member corporation is directly or indirectly owned by a common owner or owners." Id. § 5811(22). A "unitary business" is "one or more related business organizations engaged in business activity both within and without the State among which there exists a unity of ownership, operation, and use; or an interdependence in their functions." Id. § 5811(23).

¶ 18. The Department's regulations define a unitary business as "one or more related business organizations doing business both within and without the State where there is a unity of ownership, operation and use. . . . [or] interdependence in their functions." Code of Vt. Rules 10-060-040, Unitary Combined Reporting (Reg. § 1.5862(D)), § 6(a) [hereinafter Unitary Combined Reporting]. The regulations provide factors to consider in determining whether an interdependence of functions exists, and further state that the regulations adopt the decisional law of the U.S. Supreme Court. Id. § 6(b) ("Vermont's 'interdependence of functions test' extends as far as, but no further than, the constitutional limits found by the Court."). Because the regulations adopt the constitutional standard as the limit of the taxing authority, we focus on the Supreme Court's description of that standard.

¶ 19. As explained above, pursuant to constitutional law, apportionment may be applied only where the taxpayer's activities within the state are integral segments of an interstate unitary

9

business.  The U.S. Supreme Court has not adopted a bright-line test for determining if operations are unitary.  See Container Corp., 463 U.S. at 178 n.17 (rejecting adoption of bright-line rule).  Instead, the determination is made by looking at several indicators to determine if the subsidiary derives contributions to its income resulting " 'from functional integration, centralization of management, and economies of scale.' " F.W. Woolworth Co. v. Taxation & Revenue Dep't of N.M., 458 U.S. 354, 364 (1982) (quoting Mobil Oil Corp., 445 U.S. at 438).

¶ 20.    The Court has expanded upon these factors, explaining that a unitary business is indicated where "the out-of-State activities of the purported 'unitary business' [are] related in some concrete way to the in-State activities." Container Corp., 463 U.S. at 166.  In other words, there is an exchange of value "beyond the mere flow of funds arising out of a passive investment or a distinct business operation." Id.  The unitary principle applies where similar enterprises are operating in various jurisdictions and are "linked by common managerial or operational resources" and benefit from economies of scale. Id.  In determining whether companies operate separately, the important indicator is not the form of the business or the potential for integration, but whether the economic realities of business indicate that there is linkage.  See F.W. Woolworth, 458 U.S. at 362; Mobil Oil Corp., 445 U.S. at 441.  These factors are not exclusive or exhaustive, and no one factor is dispositive.  See Malpass v. Dep't of Treasury, 833 N.W.2d 272, 282 (Mich. 2013).

¶ 21.    The Department's regulations echo the factors identified by the Supreme Court and list several circumstances as indicators that there is an interdependence of functions.  These include: operations are in the same line of business; entities have a vertically structured business; strong centralized management; goods or services are exchanged at non-arm's-length prices; cost-savings results from joint or shared activities; and exercise of control.  Unitary Combined Reporting § 6(c).

10

C.  Analysis of Factors

¶ 22.   In support of its decision that MMC was part of AIG's unitary operations, the Commissioner relied primarily on the following facts: AIG played a significant role in MMC's financial operation; AIG asserted management control over MMC; AIG had a joint real estate venture with MMC; AIG used MMC to build its business and grow its brand; and AIG provided MMC with centralized services.  We conclude that some of these findings are not supported by the evidence and that AIG has met its burden of demonstrating that MMC is not part of its unitary group.  In reaching this conclusion, we consider the evidence in light of the factors identified in the Unitary Combined Reporting regulations, and the guidance provided by the U.S. Supreme Court in its decisions.

i.  Economies of Scale

¶ 23.   In Container Corp., the Court explained that where a subsidiary engages in the same type of operation as the parent, there is more probability that the businesses will become integrated through economies of scale or operational functions or the sharing of expertise.  463 U.S. at 178.  Because MMC is a ski resort and therefore its business type is not similar to AIG's insurance and financial service business, there is no opportunity for common centralized distribution or sales, and no economy of scale realized by their operations.  See Allied-Signal, Inc. v. Dir., Div. of Taxation, 504 U.S. 768, 788 (1992) (noting that economies of scale "could not exist" because the entities' business activities were unrelated).

ii.  Centralization of Management

¶ 24.   Under the Department's regulations centralized management is evidenced by centralized policymaking in areas such as "purchasing, accounting, finance, tax compliance, legal services, human resources, health and retirement plans, product lines, capital investment and marketing."  Unitary Combined Reporting § 6(c)(3).  Further the Supreme Court has explained that while it is important to assess the degree to which the parent is involved in the subsidiary's

11

day-to-day operations, the key question is "whether the management role that the parent does play is grounded in its own operational expertise and its overall operational strategy." Container Corp., 463 U.S. at 180 n.19.

¶ 25.    The Department presented evidence to show that AIG had control over MMC's management.  One of AIG's witnesses described how MMC was acquired by AIG's former CEO as "a toy or a hobby."  AIG as the sole shareholder of MMC appointed the MMC board members. AIG appointed MMC's CEO, and MMC's CFO.  Two of MMC's six directors were AIG officers—the Senior Vice President of the Investments and Financial Services division of AIG, and the Vice President for AIG Real Estate Investments division of AIG.  Neither individual was, however, on the Board of Directors of AIG or any AIG affiliate.  In addition, those two board members were not officers of MMC.  None of MMC's officers in 2006 was a current or former employee of AIG or an AIG affiliate.

¶ 26.    MMC did not have common purchasing, advertising, or marketing with AIG. MMC had its own office space and facilities.  MMC had its own computer systems and accounting staff and retained its own legal counsel.  MMC had separate human resources personnel.  AIG provided some services to MMC, such as offering MMC employees access to its life-insurance and ERISA-related benefits, but the evidence indicated MMC paid arm's-length prices for these services.

¶ 27.    Based on this evidence, the Commissioner determined that AIG provided "financial and asset management expertise and various corporate services, including life insurance and retirement benefits, tax, financial, regulatory, accounting, and other centralized corporate services."  The Commissioner correctly focused on the level of control that AIG asserted over MMC's operations.  In this regard, it is significant that AIG appointed MMC's board of directors and its CEO and CFO.  But, none of MMC's officers were officers of AIG or an AIG affiliate, and the U.S. Supreme Court has found a lack of centralized management when there was no

overlap in officers between entities. See F.W. Woolworth, 458 U.S. at 366 n.15 (concluding operations not unitary where none of subsidiaries' officers were current or former employees of parent).

¶ 28. Further, the evidence failed to show that AIG's control over appointments to MMC's board and management manifested in actual control over MMC's operations. See Container Corp., 463 U.S. at 180 n.19 (explaining that critical part of test is not potential for control, but actual integration and operational control). MMC had its own offices and employees, and control over its staff. Most importantly, AIG and the AIG executives on MMC's board did not contribute any operational expertise to assist MMC or set MMC's overall strategy. MMC made its own operating decisions. See ASARCO, 458 U.S. at 323-25 (explaining that operations are not unitary when subsidiaries operated independently and do not seek approval from parent on operational or management decisions). Therefore, the evidence shows that the type of oversight and management involvement was that provided by any parent to its subsidiary, and was insufficient to show unitary operations. See F.W. Woolworth, 458 U.S. at 369-70 (explaining that where parent is not involved in long-range planning, company operations, accounting, public relations, or labor relations, minimal oversight is part of normal interaction with subsidiary and not indicative of unitary operations).

¶ 29. On appeal, the Department also argues that strong centralized management is indicated by AIG's involvement with MMC on a real estate development project called Spruce Peak. The evidence on this project is as follows. MMC has 99% interest in Spruce Peak, and the remaining 1% is owned by a different AIG-owned business. The project's purpose was to develop and sell real property at the ski resort. A consultant was hired as the project director of Spruce Peak.[3] The project director testified that he communicated with AIG officers who were on

---

[3] The Commissioner's decision notes that while there was no direct evidence, it is likely that the director was located by AIG. Given the Commissioner's acknowledgement that there was no evidence to support this inference, we do not consider it.

13

MMC's board, but in a very limited manner. His testimony describes the project as a discrete business enterprise, and he explained that on issues of real estate development, he did not consult with AIG officers because it was not their business line and they did not have expertise to offer. He stated that Spruce Peak did not have common purchasing with AIG businesses, maintained its own office space, and maintained its own accounting staff. The Commissioner found that although AIG's active involvement in Spruce Peak was greater prior to 2006, in 2006 it included frequent communications between AIG and Spruce Peak. At most, the evidence demonstrates that AIG was involved in this development, but there is nothing to indicate that AIG lent expertise to the success of the project or integrated it with any of its other businesses.

### iii. Functional Integration

¶ 30. Another important factor identified by the Department's regulations and the Supreme Court is the degree of functional integration. Functional integration refers to the extent to which a subsidiary is integrated into the parent's business outside the state. Under the U.S. Supreme Court's jurisprudence, functional integration occurs where business segments pool resources or have integrated processes that affect the operations of the segments. See F.W. Woolworth Co., 458 U.S. at 364-65. Functional integration can include centralization of processes and controlled interaction. Exxon Corp. v. Wis. Dep't of Revenue, 447 U.S. 207, 224 (1980); see Malpass, 833 N.W.2d at 282 (describing functional integration as "the extent to which business functions are blended to promote a unitary relationship"). Several of the factors in the Unitary Combined Reporting regulations relate to functional integration. These include: operations in the same line of business; the extent the entities are different steps of a vertically structured business; the existence of non-arm's-length pricing between entities; the existence of benefits from joint purchasing or common activities; the extent that joint activities benefit the income-producing activities of the unitary business; and the exercise of control by one entity over another. Unitary Combined Reporting § 6(c)(1), (2), (6)-(9).

14

¶ 31.    In Woolworth, the Supreme Court addressed the issue of functional integration.  In that case, New Mexico sought to tax a portion of dividends that parent Woolworth received from its subsidiaries.  Woolworth was engaged in a retail business through chains of department stores selling a wide range of goods.  The subsidiaries were engaged in retail business of purchasing wholesale goods and selling directly to customers.  The Court determined that there was little functional integration between Woolworth and its subsidiaries.  The Court relied on the facts that "no phase of any subsidiary's business was integrated with the parent's"; the subsidiaries independently sited stores, advertised and did accounting; and there was no centralized manufacturing or warehousing.  458 U.S. at 365.  Further, there was no centralized training, and the subsidiaries obtained their own financing.  Id. at 364-66.

¶ 32.    Here, the facts demonstrate a similar lack of integration.  AIG and MMC operate in different lines of business.  They are not part of a vertically integrated business.  The entities do not engage in joint purchasing or other common activities.  MMC does its own advertising and does not share offices or services with AIG.  AIG held ten conferences and events at MMC in 2006, but AIG paid market prices for these events.  In addition, AIG employees received discounted resort services at MMC.  Other than provision of those services there was no exchange of goods or services between MMC and other AIG unitary group members.

¶ 33.    The main integration found by the Commissioner was that MMC received substantial financial assistance from AIG.  MMC had no operating revenue in excess of its operating expenses and therefore no ability to fund capital improvements or borrowing through its routine operations.  AIG was MMC's only lender, and all of MMC capital and borrowing decisions required approval by AIG senior management.  In 2006, AIG provided lines of credit to MMC equal to about $32 million, which exceeded 150% of MMC's gross operating revenue for the year of about $20 million.  During 2006, the rates varied from 4.296% to 5.289%, and were

based on the LIBOR rate[4] plus three basis points. The Commissioner described these loans as made at "remarkably favorable interest rate" when compared to the prime rate at the time.

¶ 34. Certainly, AIG's influx of funds was important to MMC; the question is whether this funding is sufficient to indicate that the two entities had unitary operations. In Container Corp., the U.S. Supreme Court explained the distinction between capital transactions that serve an investment purpose and those that are related to an operational function. 463 U.S. at 180 n.19. In that case, the parent held or guaranteed half of the subsidiaries' long-term debt, and the Court concluded that because the investments were part of an effort to grow the overseas operations, they related to operations. Id. In addition, the financing was accompanied by other indicators of unitary operations. The parent and the subsidiaries were engaged in the same kind of business, and the Court emphasized that the parent "provided advice and consultation regarding manufacturing techniques, engineering, design, architecture, insurance, and cost accounting" and "assisted its subsidiaries in their procurement of equipment." Id. at 173. Thus, the financing was coupled with an integration of functions and operations.

¶ 35. We conclude that the financing provided by AIG to MMC served an investment rather than operational function. The financing was not part of an AIG operational goal to grow part of its business. Further, there is no operational integration between AIG's insurance and financial businesses and the ski resort operated by MMC. Because the companies engage in different lines of business there was no common purchasing of goods, advertising, or use of facilities. See BIS LP, Inc. v. Dir., Div. of Taxation, 26 N.J. Tax 489, 500 (N.J. Tax Ct. 2011) (concluding there was no functional integration or economies of scale because entities engaged in different businesses); Maytag Corp. v. Dep't of Revenue, 12 Or. Tax 502, 508-09 (T.C. 1993) (explaining that because companies made different products there was no functional integration because there was "no common manufacturing facilities, engineering functions or research and

---

[4] The Commissioner's decision explains that LIBOR is the London Inter-Bank Offered Rate.

16

development activities"). Where intercompany financing is not also accompanied by an overlap in operational function or a lending of expertise, courts have concluded that the operations are not unitary. See Tenneco West, Inc., 286 Cal. Rptr. at 365-66 (concluding that parent's financing was nonunitary because it served investment function not operational function); Gen. Mills, 795 N.E.2d at 564-65 (concluding parent's services to subsidiary served investment rather than operational function where lines of business not integrated); Nabisco Brands, Inc. v. Dep't of Revenue, No. TC-MD 010109A, 2003 WL 21246425, at *3 (Or. T.C. Mag. Div. Apr. 3, 2003) (holding that investment into subsidiaries did not amount to functional integration sufficient to create unitary relationship where no other indicators were present).

¶ 36. Diverse lines of business can form a unitary business group where other indications of unitary operations and use are present. See Dental Ins. Consultants, Inc. v. Franchise Tax Bd., 1 Cal. Rptr. 2d 757, 760-61 (Ct. App. 1991) (holding that insurance consulting company and framing subsidiary were unitary business despite diverse business lines given sharing of operational functions and "[s]ubstantial intercompany loans"); Mole-Richardson Co. v. Franchise Tax Bd., 269 Cal. Rptr. 662, 667-68 (Ct. App. 1990) (concluding that two businesses with diverse business enterprises were unitary given strong centralized management, sharing of offices and services, and fact that property of one company was mortgaged to fund improvement of other company). But such is not the case here.

¶ 37. Further, the Commissioner's description of this financing as "non-arm's-length loans," lacks support in the record. The loans were not interest-free; MMC paid interest on these loans, and that interest rate was variable, set at the LIBOR rate plus three basis points. Although the Commissioner characterized this as a favorable interest rate, this inference was based on the Commissioner's comparison of the loan interest rate to the Commissioner's own research of the U.S. prime rate at the time, and not on evidence in the record of what market interest rates were for other types of similar loans. Without this type of evidence there is no support for the

Commissioner's findings that "an arm's-length lender" would not have provided MMC with the kind of credit or interest rate provided by AIG. Therefore, we must view these loans as arm's-length transactions.[5]

¶ 38. The Commissioner also found that there was functional integration because AIG used MMC's resort to build its brand and "build broker and other business relations to drive AIG business." These findings would be significant if supported by the evidence since it would demonstrate the type of "substantial mutual interdependence" between the parent and the subsidiary that is indicative of unitary operations. F.W. Woolworth Co., 458 U.S. at 371. However, none of the evidence demonstrates that AIG used MMC as a tool for enhancing its brand or building its business.

¶ 39. As to the brand, the Commissioner described how AIG executives testified that after the federal bailout AIG needed to rebuild its brand and adopted several strategies in support of this goal. The Commissioner found that MMC was used as a part of this strategy to enhance AIG's brand. The shortcoming of this reasoning, however, is that the relevant tax year is 2006 and the federal government bailout occurred in 2008. The evidence does not show that prior to 2008 AIG was working on rebranding or that MMC was a part of that.

¶ 40. Further, the evidence does not support the Commissioner's finding that AIG used MMC to build its broker relations and fuel growth. The evidence indicated that AIG held conferences at MMC, and AIG employees received discounts at MMC. There was no evidence that this benefitted AIG. AIG paid market rates for the events held at MMC and there was no evidence that the events generated business for AIG or contributed to AIG's operations. There was also no evidence that the employee discounts contributed to hiring or growing AIG's brand.

---

[5] AIG filed a motion seeking permission for leave to submit a surreply brief in response to arguments in the Department's reply brief that AIG's evidence did not clearly show that MMC paid any of the principal on the loans it had with AIG. The Department then filed a motion for permission to file a brief in response. The motions are denied. Issues may not be raised for the first time in a reply brief. Bigelow v. Dep't of Taxes, 163 Vt. 33, 37-38, 652 A.2d 985, 988 (1994). Therefore, we do not reach this issue and we do not consider the additional briefing.

Although we defer to the Commissioner's findings, where there is no evidence in the record to support this finding, we must reverse. Travia's Inc., 2013 VT 62, ¶ 12 (stating that Commissioner's factual findings will be affirmed "unless clearly erroneous"). Therefore, in assessing whether functional integration existed, we do not consider this fact.

¶ 41. In sum, MMC met its burden of demonstrating that its operations were not unitary with AIG. MMC operated in a different line of business than AIG. AIG had a role in appointing members to MMC's board and oversaw some financing, but there was no direct operational control. There was no overlap of officers between the entities, and AIG did not exercise strong centralized management over MMC. Although AIG provided financing to MMC, this served more of an investment than an operational function insofar as AIG did not use its financing to achieve an operational goal and there is no evidence that the financing was at a below-market rate. MMC's activities were not functionally integrated with AIG, and there were no economies of scale realized through the businesses' separate operations. AIG realized no benefit from its involvement with MMC. Therefore, we conclude that MMC was not part of the AIG unitary group for tax reporting purposes.

D. Other State Reporting

¶ 42. On appeal, the Department argues that unitary operations should be assumed in this case based on the fact that AIG included MMC in its unitary combined reporting in its 2006 tax returns for each of the other fifteen states that use unitary combined income tax reporting. The Department asserts that by including MMC in the AIG unitary group in those states, AIG has admitted that its operations are unitary with MMC.

¶ 43. In support, the Department cites to some cases where courts have made unitary findings and noted the parent's inclusion of a subsidiary in its tax filings in other states. In those cases, however, the fact that the entity was included in other states' reporting as part of the unitary group was not determinative, but in addition to other factors showing a unity of operations. See,

19

e.g., <u>Gannett Co., Inc. v. State Tax Assessor</u>, 2008 ME 171, ¶¶ 6, 20-27, 959 A.2d 741 (concluding that entities, which had centralized tax, legal, audit, financial and risk management services, shared operational expertise, and had interlocking directors and officers were part of unitary group and noting admission by parent that entity part of unitary group in filing in other states); <u>Russell Stover Candies, Inc. v. Dep't of Rev.</u>, 665 P.2d 198, 201-02 (Mont. 1983) (concluding subsidiary part of unitary reporting group based on centralization of management and unity of operations, and indicating that parent "admitted" fact of integration by including subsidiary on other states' tax forms).

¶ 44. We acknowledge that an entity's representations in other states can be a factor, but it cannot create a unitary operation where it does not otherwise exist. Here, as explained above, the evidence demonstrates a lack of unitary operations. Therefore, regardless of the reporting AIG made in other states, Vermont is still precluded from taxing AIG's operations outside the state by constitutional limitations. See <u>Container Corp.</u>, 463 U.S. at 164 (stating that Due Process and Commerce Clauses of U.S. Constitution limit state's ability to tax value earned outside state).

¶ 45. Because AIG has met its burden of demonstrating that MMC is a discrete entity and not part of the AIG unitary group, we affirm the decision of the superior court. We do not reach the question of whether the 2011 assessment was barred by the statute of limitations.

<u>Affirmed</u>.

FOR THE COURT:

_____

Chief Justice