*Vermont Nat'l Tel. Co. v. State*, No. 528-9-18 Wncv (Teachout, J., July 31, 2019).

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

## STATE OF VERMONT

| | |
|---|---|
| SUPERIOR COURT | CIVIL DIVISION |
| Washington Unit | Docket No. 528-9-18 Wncv |

**Vermont National Telephone Company**
    **Taxpayer–Appellant**

        **v.**

**State of Vermont Department of Taxes**
    **Appellee**

### DECISION ON APPEAL

Taxpayer Vermont National Telephone Company (VNAT) appeals from the Commissioner of Taxes' determination that capital gain on its 2013 sale of two Federal Communications Commission (FCC) telecommunications licenses is properly allocated to, and thus taxable by, Vermont pursuant to Department of Taxes Regulation § 1.5833-1.[1] VNAT also appeals the assessment of an underpayment penalty imposed pursuant to 32 V.S.A. § 3202(b)(3).

Regulation § 1.5833-1 addresses the apportionment and allocation, for tax purposes, of corporate income arising from business "conducted both within and outside this State." 32 V.S.A. § 5833(a).[2] Apportionment and allocation are processes for determining how much of the corporate taxpayer's income will be taxed. The parties agree that the gain on the sale of the licenses, which were held purely for investment purposes, is "nonbusiness" income for purposes of the rule. The principal issue is where the licenses are properly "located" if they can be located anywhere at all.[3]

VNAT argues that the licenses have a New York State location exclusively and thus the gain from their sale must be allocated to New York and cannot be taxed by Vermont. The Commissioner determined, and the State argues, that the licenses have *no location* and thus the gain from their sale is properly allocated to Vermont, VNAT's "commercial domicile."

---

[1] At all times relevant to this case, VNAT was part of a "unitary group" doing business in Vermont and elsewhere that included subsidiaries VTel Wireless, Inc., Four Winds Farm, Inc., and VTel Data Networks, Inc. There is no dispute in this case about VNAT's unitary group reporting or other need to distinguish between VNAT and its subsidiaries or among the related corporations. For ease of reference, the court will refer to VNAT and its subsidiaries collectively as VNAT. While the unitary business principle provides crucial legal context to this case, there is no specific dispute about it presented. For more on the unitary business principle and unitary group reporting in Vermont generally, see 32 V.S.A. § 5862(d); Department of Taxes Regulation § 1.5862(d); *AIG Ins. Mgmt. Servs., Inc. v. Vermont Dep't of Taxes*, 2015 VT 137, 201 Vt. 9.

[2] The legislature substantially amended 32 V.S.A. § 5833 in 2019. 2019, No. 51, § 8. The amendment "shall take effect on January 1, 2020, and apply to tax years starting after that date." *Id*. § 41(3). The amendment therefore does not apply to and has no bearing on this case.

[3] At issue before the Commissioner also was an issue related to VNAT's 2012 taxes. The Commissioner resolved that issue in favor of the Department, and VNAT has not raised any issue with that ruling on appeal. The court therefore treats that ruling as beyond the scope of review and will not address it. This case is limited to those parts of the Commissioner's Determination addressing VNAT's 2013 taxes.

The principal controversy is one of interpretation. The parties interpret Regulation § 1.5833-1(e), which describes how corporations should allocate nonbusiness income, to different effect. There is no dispute about the underlying facts, and VNAT is not challenging the constitutionality of Regulation § 1.5833-1 generally or the constitutionality of the Department's interpretation of it specifically.

*Standard of Review*

The Court has described the standard of review in tax appeals as follows:

> Courts presume that the actions of administrative agencies are correct, valid and reasonable, absent a clear and convincing showing to the contrary. Therefore, judicial review of agency findings is ordinarily limited to whether, on the record developed before the agency, there is any reasonable basis for the finding. Courts must remember that "(a)dministrative agencies belong to a different branch of government," and that "(t)hey are separately created and exercise executive power in administering legislative authority selectively delegated to them by statute."

*State Dep't of Taxes v. Tri-State Indus. Laundries, Inc.*, 138 Vt. 292, 294 (1980) (citations omitted).

*Regulation § 1.5833-1(e) income allocation*

In 2003, VNAT purchased two FCC licenses granting it exclusive telecommunications use of a definite part of the electromagnetic spectrum covering two specific geographic areas each wholly within New York State. VNAT purchased and held the licenses purely for investment purposes. It never constructed the on-the-ground infrastructure necessary to use the rights granted by the licenses, and it did not otherwise use those rights in its regular business operations.[4] VNAT sold both licenses in 2013 to AT&T Mobility Spectrum LLC, generating a substantial capital gain. VNAT treated the gain as having arisen from an asset located in New York State under Vermont Regulation § 1.5833-1(e) and thus paid no corporate income tax on the gain to Vermont. Following an audit, the Department assessed VNAT for unpaid tax on this gain, interest, and an underpayment penalty.

In the administrative case before the Commissioner, there was no dispute that the gain from the sale of the licenses is properly classified as *nonbusiness* income, meaning that it arose *not* from the taxpayer's regular business operations.[5] There also is no dispute that the licenses, which represent rights granted by a governmental entity, are *intangible* assets.

---

[4] VNAT claims that merely holding such licenses can be a business use of them insofar as ownership excludes competitors from using the licensed spectrum. However, there is no dispute in this case that these licenses were held exclusively for investment purposes and their sale generated nonbusiness income only.

[5] The court takes no position on whether the income may be better characterized as business or nonbusiness income and defers to the parties' agreement on the issue.

2

Regulation § 1.5833-1 prescribes methods for *apportioning business* income, Regulation § 1.5833-1(a)–(d), and *allocating nonbusiness* income, Regulation § 1.5833-1(e). Apportionment—applicable to business income only—refers to the "fair" method of aggregating the taxpayer's Vermont and non-Vermont income and then calculating according to a formula the amount that will be used for Vermont tax purposes. Allocation—applicable to nonbusiness income only—refers to a method of assigning income from a specific asset wholly to the state where it is located or to the taxpayer's commercial domicile if the asset has no location. In either event, if the assigned state is Vermont, the income will be taxed by Vermont. If it is a state other than Vermont, the income will not be taxed by Vermont.

Regulation § 1.5833-1(a)(2) provides: "All items of nonbusiness income (income which is not includable in the apportionable tax base) shall be allocated as provided in Sec. 1.5833-1(d)(6)." Section 1.5833-1(d)(6) further provides:

> Nonbusiness receipts are all receipts other than business receipts resulting from operations unrelated to [the taxpayer's] regular business operations. Typically nonbusiness receipts are comprised of passive or portfolio income. Income from dividends, interest and capital gains will be considered nonbusiness income unless the acquisition, management, and disposition of the underlying property generating the income constitute an integral part of the taxpayer's regular business operations.

The allocation provision for nonbusiness income is as follows: "Nonbusiness income will be allocated to the state in which the income producing assets are located. If the income producing asset has no situs, the income will be allocated to the state of commercial domicile, the principle [sic] place from which the business is directed or managed." Regulation § 1.5833-1(e).

There is no indication that "situs" is being used as a term of art (such as *tax situs* or *business situs*) in the second sentence of Regulation § 1.5833-1(e) to mean anything other than "location," the parallel term expressly used in the first sentence. See Merriam-Webster Online Dictionary, available at https://www.merriam-webster.com/dictionary/situs (defining *situs* as "the place where something exists or originates").

The licenses at issue in this case are *intangible* assets. An intangible asset is "[a]n asset that is not a physical object." Black's Law Dictionary 113 (7th ed. 1999). An intangible asset, not being a physical object, has no *intrinsic* location. See *Mobil Oil Corp. v. Commissioner of Taxes of Vermont*, 445 U.S. 425, 445 (1980) (noting that locations of intangible assets are "fictions"); *First Bank Stock Corp. v. State of Minnesota*, 301 U.S. 234, 240 (1937) ("The rule that property is subject to taxation at its situs, within the territorial jurisdiction of the taxing state, readily understood and applied with respect to tangibles, is in itself meaningless when applied to intangibles which, since they are without physical characteristics, can have no location in space."); *Wheeling Steel Corp. v. Fox*, 298 U.S. 193, 209 (1936) ("When we deal with intangible property . . ., we encounter the difficulty that by reason of the absence of physical characteristics they have no situs in the physical sense."); see also Factors To Be Considered In Determining A Corporation's Commercial Domicile, J. Multistate Tax'n 6, 8 (Oct. 2003) ("Unlike tangible property, for tax purposes intangible property must be assigned a situs.").

3

VNAT argues that because use of the licenses can only occur in New York and nowhere else, the licenses should be deemed to be located in New York. An asset that comprises a land interest can be different, however, from an asset that is land. For example, one may own 500 acres of timberland in Montana as an investment asset. Such an asset has a location in Montana. Or, one may own 100% of the stock in the Montana Timberland Corporation, Inc., which is the owner of 500 acres of timberland in Montana. The stock certificate is an intangible asset with no location, even though any activity to generate income from the land would have to occur in Montana. It is akin to owning a share of stock in Weyerhaeuser: if the share is sold, any gain is taxed to the owner where the owner pays taxes, regardless of where the land is that Weyerhaeuser owns.

The U.S. Supreme Court has described this distinction as follows:

> [T]here are many legal interests other than conventional ownership which may be created with respect to land of such a character that they may be constitutionally subjected to taxation in states other than that where the land is situated. No one has doubted the constitutional power of a state to tax its domiciled residents on their shares of stock in a foreign corporation whose only property is real estate located elsewhere, or to tax a valuable contract for the purchase of land or chattels located in another state, or to tax a mortgage of real estate located without the state, even though the land affords the only source of payment. Each of these legal interests finds its only economic source in the value of the land, and the rights which are elsewhere subjected to the tax can be brought to their ultimate fruition only through some means of control of the land itself. But the means of control may be subjected to taxation in the state of its owner whether it be a share of stock or a contract or a mortgage. There is no want of jurisdiction to tax these interests where they are owned in the sense that the state lacks power to appropriate them to the payment of the tax. No court has condemned such action as so capricious, arbitrary or oppressive as to bring it within the prohibition of the Fourteenth Amendment, for it is universally recognized that these interests are of themselves in some measure clothed with the legal incidents of property enjoyed by their owner, in the state where he resides, through the benefit and protection of its laws.

*Curry v. McCanless*, 307 U.S. 357, 365 n.3 (1939) (citations omitted). An intangible asset, merely because it stands in some relation to a tangible asset, does not for that reason necessarily possess all the qualities of the tangible asset to which it relates. The same is true in this case when comparing the licenses, which have no location, with the business use of the licenses, which may be thought to have a discernible location.

Because the licenses that generated the disputed income have no intrinsic location, and Regulation § 1.5833-1(e) allocates such income for tax purposes to the state of commercial domicile, the only remaining issue relating to taxability is whether the Commissioner's determination that Vermont is VNAT's commercial domicile is error. That issue is addressed below.

VNAT arrives at a different result under Regulation § 1.5833-1(e), however.  It argues essentially as follows.  (1) Regulation § 1.5833-1 first distinguishes between business income and nonbusiness income.  (2) The nonbusiness income provision, Regulation § 1.5833-1(e), further distinguishes between income-producing assets with a location and those without a location and does not expressly distinguish between tangible and intangible property.  (3) The lack of express distinction between tangible and intangible nonbusiness assets means that Regulation § 1.5833-1(e) must include the possibility that both types of property can have a physical location.  (4) Relevant case law, particularly *Whitney v. Graves*, 299 U.S. 366 (1937), demonstrates that intangible assets can have a physical location, and that the licenses at issue in this case can be "localized" to New York.

VNAT's argument does not lead to the conclusion that the disputed income should not be allocated to Vermont.  There is no need to read Regulation § 1.5833-1(e) as including the unlikely (and unstated) proposition that an intangible asset can have a physical location in some intrinsic sense.  The apportionment part of the regulation refers in several places expressly to tangible property, and Regulation § 1.5833-1(d)(5) expressly addresses business income from intangible assets and includes that income within the apportionable tax base.  Regulation § 1.5833-1(e) does not expressly use the terms tangible or intangible, but by expressly allocating income from assets with no location it effectively addresses nonbusiness income from intangible assets.  Nothing in the record implies that Regulation § 1.5833-1(e) must or should be interpreted to embrace the physical impossibility that an intangible thing, which has no physical existence, nevertheless has some intrinsic geographic location.

Neither *Whitney* nor any other case supplied by VNAT stands for the proposition that an intangible asset has any intrinsic location.  *Whitney* addressed the constitutionality of a tax imposed by New York State on "the profits realized by a nonresident upon the sale of a right appurtenant to membership in the New York Stock Exchange."  *Whitney*, 299 U.S. at 369.  The court found the New York tax constitutional because the intangible rights at issue could be "localized" to New York—that is, determined to have a tax situs in New York—*despite* being intangible rights otherwise without any intrinsic physical location.  *Id*. at 372.  In other words, assigning a tax situs of New York to the income did not violate the Constitution even though the owner of the asset was domiciled elsewhere.  The Court clearly did not rule that the income could not also be taxed by the non-New York state of the taxpayer's domicile or commercial domicile.  See *id*. at 373–74 (addressing this issue).  The *Whitney* Court was simply addressing the constitutionality of the tax actually imposed.

*Whitney* and similar authorities are unhelpful to this case.  The issue here is not whether New York State could have constitutionally imposed a tax on VNAT's sale of the licenses.[6]

---

[6] Certain of the Commissioner's conclusions are irrelevant to this case.  For example, the Commissioner determined: "Since Taxpayer never charged or collected broadcast contract fees from New York residents for broadcast services, and never engaged in any 'activities with respect to [its] intangibles so as to avail [itself] of the protection and benefit of the laws of' in [sic] New York, there was also nothing to create a tax situs in that state."  Commissioner's Determination at 22.  There is no New York tax at issue in this case, however, and there is no reason under the Vermont rule to determine whether a New York tax situs could successfully be asserted.  Also, an implied premise that seems to run throughout much of the Determination is that an intangible asset can have only one location for tax purposes.  See *Curry v. McCanless*, 307 U.S. 357, 373–74 (1939) ("If we enjoyed the freedom of the framers it is

Regardless whether it could, the question in this case is simply what Regulation § 1.5833-1(e) requires. Regulation § 1.5833-1(e) requires allocating the income to the state of VNAT's commercial domicile. No other issue regarding taxability is presented. If VNAT has a constitutional objection to this outcome, it was never raised.

*VNAT's commercial domicile*

The Commissioner determined that VNAT's commercial domicile is Vermont.[7] VNAT does not contest the thrust of the Commissioner's analysis of what "commercial domicile" means and does not argue that any of the component findings by the Commissioner lacks substantial evidentiary support. Rather, VNAT argues that a proper weighting of relevant considerations shows that its commercial domicile is Connecticut because that is where its president, treasurer, chief executive officer, and board member, Dr. Michel Guite, has a residence with a home office that he sometimes uses for VNAT business and when making strategic business decisions, and the board sometimes meets there.

Regulation 1.5833-1(e) describes commercial domicile as the "principle [sic] place from which the business is directed or managed." There appears to be no more specific Vermont regulatory or statutory definition of the expression. Following a more detailed analysis of the concept, the Commissioner generally summarized that "'[T]he true test must be to consider all the facts,' to determine where the 'actual conduct of business operations' occurs, and which state 'gives the greatest protection and benefits to the corporation.'" Commissioner's Determination at 42; accord Factors To Be Considered In Determining A Corporation's Commercial Domicile, J. Multistate Tax'n 6 (Oct. 2003).

The Commissioner's detailed findings demonstrate that nearly all of VNAT's varied business operations and day-to-day direction and management occur in Vermont. Dr. Guite's home office in Connecticut and occasional board meetings there are, by comparison, not significant and do not reveal an actual commercial domicile in Connecticut versus Vermont.

The gain at issue in this case is properly allocated to VNAT's commercial domicile pursuant to Regulation 1.5833-1(e). VNAT's commercial domicile is Vermont. The Department therefore properly included this income in the calculation of VNAT's taxes.

---

possible that we might, in the light of experience, devise a more equitable system of taxation than that which they gave us. But we are convinced that that end cannot be attained by the device of ascribing to intangibles in every case a locus for taxation in a single state despite the multiple legal interests to which they may give rise and despite the control over them or their transmission by any other state and its legitimate interest in taxing the one or the other. While fictions are sometimes invented in order to realize the judicial conception of justice, we cannot define the constitutional guaranty in terms of a fiction so unrelated to reality without creating as many tax injustices as we would avoid and without exercising a power to remake constitutional provisions which the Constitution has not given to the courts.").

[7] Unitary combined reporting requires each member of the unitary group to separately account for its "nonbusiness income or loss allocable to this state." Vermont Department of Taxes Regulation § 1.5862(d)-7(c)(5). The Commissioner thus analyzed the issue of commercial domicile with regard to each unitary group member–seller, VNAT and VTel Wireless, Inc. VNAT's objection to the Commissioner's Determination on these matters is not dependent on the identity of the specific seller. Thus, the court will continue to refer to the unitary group members collectively as VNAT.

*Discretion and Constitutionality of the penalty*

The Department imposed a penalty due to VNAT's underpayment of taxes pursuant to 32 V.S.A. § 3202(b)(3). Subsection (b)(3) gives the Department discretion to impose a penalty due to mere underpayment, regardless of negligence or fraud, which are addressed in other provisions. VNAT argues that the Commissioner failed to exercise discretion by *automatically* imposing the penalty and that doing so resulted in an unconstitutionally excessive fine.

Subsection 3202(b)(3) allows, but does not require, the Commissioner to impose a penalty for mere underpayment of taxes. The penalty was automatically assessed due to VNAT's underpayment. However, the Vermont Supreme Court already has rejected an argument, substantially similarly to VNAT's, that automatic imposition of a penalty is an impermissible failure to exercise discretion. Addressing analogous circumstances, the Court explained, "The fact that the penalty was imposed automatically by the Department of Taxes when the delinquency was discovered does not negate the exercise of discretion on the part of the Commissioner, particularly when any penalty assessed is subject to individual review upon appeal to the Commissioner. It merely represents the full extent to which the Commissioner has chosen to exercise his discretionary authority as granted under the statute." *Piche v. Dep't of Taxes*, 152 Vt. 229, 234 (1989) (citation omitted).

In this case, as in *Piche*, the penalty was imposed automatically and it was subject to individual review on appeal to the Commissioner. VNAT in fact objected to the Department's automatic imposition of the penalty in the course of review before the Commissioner. The Commissioner's Determination reflects consideration and rejection of VNAT's objection. Among other things, the Commissioner maintained that the penalty serves an important purpose of encouraging taxpayers with complex issues or close calls to affirmatively seek clarification from the Department rather than simply—as in this case—not paying the tax and hoping for the best. The Commissioner did not fail to exercise discretion.

The penalty also is not unconstitutionally disproportionate. The statute permitted a penalty equal to 1% of the outstanding tax liability per month and capped it at 25% of the initial deficiency. 32 V.S.A. § 3202(b)(3). There is no suggestion that the penalty imposed exceeded that permitted by statute. The penalty is a small percentage of the outstanding liability that only grows over time so long as it remains unpaid and until it reaches a statutory maximum that can go no higher than a quarter of the original deficiency. VNAP has cited no case in which a similar tax penalty has been found unconstitutional as an excessive fine. "[C]ivil tax penalties have repeatedly been held not to violate the 8th Amendment's Excessive Fines Clause." 14A Mertens Law of Fed. Income Tax'n § 55:3; see also the cases annotated at *id*. § 55:3 n.7 (describing permissible penalties of 40%, 50%, and 75%). VNAT has not demonstrated that the penalty is unconstitutional.

7

## ORDER

For the foregoing reasons, the Determination of the Commissioner is *affirmed*.

Dated at Montpelier, Vermont this ____ day of July 2019.

_____
Mary Miles Teachout
Superior Judge